**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 9, 2015**

# In the Court of Appeals of Georgia

A15A0767. KREIGER v. BONDS.

McMILLIAN, Judge.

This appeal arises out of a "Buy-Sell Agreement for Southeast Cooler Corp." (the "Agreement") executed between Steven Kreiger and Craig Bonds governing their respective shares of stock in Southeast Cooler Corp ("SCC"). Steven Krieger[1] appeals the trial court's grant of summary judgment to Bonds, and the denial of his own motion for summary judgment, on Bonds' claim for specific performance of the Agreement. Steven Krieger also appeals the denial of his motion for summary judgment on his counterclaim for specific performance.

---

[1] For clarity, we will refer to Steven Krieger and his sister, Suzanne Krieger, individually, by their full names.

"We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant. Because this opinion addresses cross-motions for summary judgment, we will construe the facts in favor of the nonmoving party as appropriate." (Citation omitted.) *Maree v. ROMAR Joint Venture*, 329 Ga. App. 282, 283 (763 SE2d 899) (2014).

SCC is a closely held corporation that manufactures walk-in coolers and freezers, ice merchandisers, and some bakery-related products. Steven Krieger was one of the two original owners of SCC, and at the time pertinent to this lawsuit, Steven Krieger served as president and chief executive officer of SCC. Bonds was hired in 2002 as controller and remained in that position until 2008 when he became chief financial officer ("CFO").[2] SCC corporate documents indicate that as of January 2009, Steven Krieger held 27,500 shares of SCC and Bonds held 5,500 shares.

On January 26, 2010, SCC adopted new bylaws (the "Bylaws") which placed certain restrictions on corporate borrowing and the use of the corporation's credit. Pertinent to this appeal, the Bylaws provided that no loan could be entered into by SCC unless authorized by a resolution of the Board of Directors, and the Board was

---

[2] At that point, Bonds became SCC's point of contact with the company's bank, Community & Southern Bank.

2

only authorized to lend money "in furtherance of any of the purposes of the Corporation" and to assist any employee or director, if approved by the holders of a majority of the voting shares.

*Buy-Sell Agreement*

Steven Krieger and Bonds entered into the Agreement on June 11, 2010 to address the future disposition of the company's stock. Section Four of the Agreement, entitled "Mandatory Put and Call Buy-Sell," provides that at any time, one shareholder may offer *both* to sell all of his shares[3] in the corporation or to buy all of another shareholder's shares. The Agreement requires that the offer be in writing and that it contain certain representations, including "[a] statement that the purchase price of the [shares] subject to the offer shall be payable in cash at closing."

The Agreement further provides that such offers remain open for 60 days, and an offeree can accept either the offer to sell or the offer to buy, but not both. But if the offeree fails to accept the offer within 60 days, the offeror has the right, within the

---

[3] The Agreement actually uses the term "Rights," which is defined to include the person's interest in SCC; share of the profits and losses of and the right to receive distributions from SCC; the right to inspect SCC's books and records; the right to participate in management; to vote on corporate matters; and the right to act as a corporate agent. We substitute the term "shares" for consistency in discussing the Agreement and the buy-sell transaction.

3

next 15 days, to either buy all of the offeree's shares or to sell all his shares to the offeree. If the offeror exercises this right, the offeree is required to sell or to buy at the offeror's request. And the closing on such a transaction must take place "on or before the 10th day after such right to purchase or sell has been exercised."

The Agreement also prescribes that

[a]cceptance by the offeree of an offer to buy or to sell and the exercise by an offeror of the right to buy or sell shall consist of a tender of all documents, duly executed, necessary to convey the [shares] being sold, with full warranties of title thereto and appropriate arrangements made for the payment of the purchase price of the [shares], as the case may be.

Moreover, under Section Two of the Agreement, neither Steven Krieger nor Bonds were permitted to transfer, assign, or pledge their shares without the prior written consent of the Corporation and the other shareholders, except that a shareholder would be allowed to pledge his shares "as security for a loan with any lending institution regularly engaged in the business of making loans" so long as the other terms of the Agreement were met.

*Steven Krieger's Representatives*

In 2010, after Steven Krieger began to experience a decline in his health and was diagnosed with probable Alzheimer's, he signed a power of attorney in favor of his sister, Suzanne Krieger. Steven Krieger also hired attorney Albert Caproni in 2010 to assist him with his estate planning. And in September 2012, Steven Krieger executed an "Irrevocable Proxy" in favor of Suzanne Krieger as to his SCC shares.

*Exercise of Put/Call Provision*

On December 6, 2012, Krieger[4] sent Bonds a letter invoking the provisions of Section Four of the Agreement and offering either to purchase Bonds' 5,500 shares of SCC or to sell Bonds his 27,500 shares at a price of $63.64 per share. The letter contained the statements required by the Agreement, including stating that the total purchase price of $350,020 for Bonds' shares, if Krieger purchased them, or the total sale price of $1,750,100 for Krieger's shares, if Bonds purchased them, "shall be payable in cash at the Closing." Bonds replied by letter dated January 28, 2013 that he was accepting Krieger's offer to sell the 27,500 shares for $1,750,100 and scheduling the closing for February 1, 2013.

---

[4] For ease of reference, we will refer to Steven Krieger and his representatives collectively as "Krieger," unless it is necessary to refer to a particular individual.

*Bank Financing*

In an effort to fund his purchase of Steven Krieger's shares, and without consulting Krieger, Bonds obtained a loan commitment letter from SCC's bank, Community & Southern Bank (the "Bank"), to SCC for an additional $737,880 for the stated purpose of purchasing Steven Krieger's shares and converting them to treasury stock. The Bank required the use of the company's assets to obtain the loan, and the loan commitment letter required that Bonds have 100% ownership of SCC and "full and single authority to obligate [SCC] for [the] debt and pledge [the] company['s] assets." Bonds signed the loan commitment letter as CFO of SCC on January 23, 2013, eight days before the scheduled closing.

Bonds also attempted to avail himself of SCC's $2,000,000 line of credit with the Bank (the "LOC") for financing the purchase. Steven Krieger was the guarantor on the LOC, but Bonds stated that as part of the transaction, he intended to release Steven Krieger and substitute himself as guarantor. And on January 30, 2013, in anticipation of the closing, $1,750,100 was transferred from the LOC to the trust account of Victor Harrison, SCC's corporate counsel.

However, upon discovering this arrangement, Krieger objected to Bonds' unilateral attempt to take out a corporate loan and to use the LOC or other company

assets in funding the stock purchase without Steven Krieger's approval as majority shareholder as required under the Bylaws. On January 31, 2013, Steven Krieger signed a letter to the Bank directing that the LOC be closed. And on February 1, 2013, at Krieger's direction, Harrison returned the $1,750,100 to the Bank from his trust account.

## *CLV Financing*

According to Harrison, Bonds then received approval for a loan from CLV Asset Recovery, LLC ("CLV") in the amount of $1,750,100 (the "CLV Loan").[5] CLV, a company organized and represented by Harrison, is primarily in the business of buying and selling notes. According to Harrison, the loan to Bonds was the only loan the company had ever agreed to make. Harrison said CLV consisted of three investors, including himself.

During discovery, Harrison identified four deposits into his firm's trust account that were intended to cover the CLV Loan, in the amounts of $73,465.95; $117,407.20; $200,000; and $1,400,080, respectively. Harrison said he exercised his

---

[5] However, Caproni stated that Harrison told him that the financing was coming from Midwest Note Recovery, LLC ("Midwest"), another company represented by Harrison, which is in the same business as CLV but was organized by Robert H. Harrison.

7

authority with CLV to move the $1,400,080 from a CLV account into his trust account, and he was responsible for one of the other three deposits. The four deposits totaled $1,790,953.15, which amounted to $40,853.15 more than the loan amount. But in his deposition, Harrison stated that one of the deposits should not have been included in his calculations, although he could not remember which deposit. But if even the smallest of the four deposits, $73,465.95, were removed from the calculation, the total amount falls to $1,717,487.20, which is $32,612.80 below the purchase price for Steven Krieger's stock. Nevertheless, Harrison testified that he was prepared to fund the sale if the appropriate documents were signed at the closing. He stated that his trust account had sufficient funds to cover the check, and the documents and calculations he provided in discovery reflect that the account did contain funds in excess of the purchase price, although that balance necessarily would have included funds from sources other than the deposits identified as coming from CLV.

Bonds stated that he had no idea what CLV was and did not know why they decided to lend him the money. He never made a loan application to CLV or provided the company with any financial information. Nevertheless, Bonds signed a "Secured Promissory Note" (the "CLV Note") and "Security Agreement" ("CLV Agreement")

8

with CLV on February 1, 2013, the day of the scheduled closing. These documents indicate that the loan was to be repaid in three days, by February 4, 2013. Under the CLV Agreement, Bonds granted CLV a security interest in and security title to his SCC shares, which attached as of February 1, 2013.

*First Scheduled Closing*

The first scheduled closing was attended by Harrison; Bonds; Scott Mercer, an attorney Bonds hired to represent him at the closing; Caproni; Suzanne Krieger, representing Steven Krieger with power of attorney; George Koenig, another attorney representing Steven Krieger; Susan Whittle, a vice president and commercial lender for the Bank; Adam Slipakoff, counsel for the Bank; and Scott Newland, another attorney for the Bank. Steven Krieger did not attend.

Although the parties communicated prior to the closing on a stock transfer agreement and other matters, issues arose at the closing regarding payment, the cancellation of the LOC, and Steven Krieger's stock certificate.

(a) *Payment*

Two days before closing, on January 30, 2015, Harrison e-mailed Caproni, identifying himself as "representing the lender of funds[6] to Craig Bonds for the purchase of stock from your client," and stating his preference for wiring the funds instead of writing a check for $1,750,100. He then invited Caproni to state his "method of preferred payment." Caproni notified Bonds that Krieger wanted a cashier's check at closing. Caproni believed that Krieger was entitled to "immediately available funds" based on the language in the Agreement requiring that payment be made in "cash."

Harrison testified that he showed up at the closing on February 1, 2013, with an unsigned check drawn on his trust account for $1,750,100.[7] Harrison was there to sign the check but would not do so until all the documents were signed. Bonds stated

---

[6] According to Suzanne Krieger, prior to the closing, Bonds indicated that Harrison would be representing *him* at the closing, but she reminded Bonds that Harrison was counsel for SCC. Krieger later terminated Harrison's representation of SCC by letter dated February 11, 2013.

[7] Harrison said that the request for a cashier's check was never relayed to him, but he would not have come to closing with a cashier's check because he would not have released the funds prior to seeing signed documents. However, Harrison asserts that he would have been happy to wire the funds or to walk to his bank to convert his signed check into a cashier's check after the documents were signed.

that Harrison showed the check to Caproni and Koenig at the beginning of the closing and asked if they wanted to verify that the funds were good. But Harrison stated only that he "raised . . . up" his unsigned check from across the room to show Krieger. Mercer asserts that they told Krieger that they had the check and that Harrison was prevented from handing the unsigned check to Krieger because Caproni interrupted the transfer by raising issues regarding the LOC. Caproni and Suzanne Krieger deny that they were ever shown a check or that any tender occurred.

(b) *Line of Credit*

On February 1, 2013, Caproni notified Mercer and Harrison he was requiring written confirmation showing the LOC had been repaid in full and the account closed as conditions for the closing. Bonds' counsel e-mailed Caproni prior to closing that Harrison was wiring the funds back to the LOC and that he would obtain confirmation from the Bank when it had received the money, and he invited Krieger to independently confirm that fact. The Bank through its representatives verbally confirmed at the closing that the LOC had a zero balance. However, neither Mercer nor the Bank provided confirmation, written or otherwise, either before or during the closing, that the LOC had been closed. In fact, Slipakoff disputed Krieger's authority to close the LOC, and Harrison asserted that SCC was not going to close the LOC.

(c) *Steven Krieger's Stock Certificate*

Mercer and Newland state that they asked Caproni for Steven Krieger's stock certificate, but Caproni responded that he did not have it and offered no explanation for its absence. Steven Krieger's representatives conceded that they did not have his stock certificate with them at the closing because it could not be located, but they believed that a replacement stock certificate could be issued.

*Termination of First Scheduled Closing*

The February 1, 2013 closing was never consummated, and the parties agree that Krieger was the first to leave the closing. However, they disagree as to the legal effect of the circumstances that led to Kreiger's departure. Bonds asserts that he made a tender on February 1, 2013 and thus performed under the Agreement and that in contrast Kreiger failed to perform when it came to the closing without Steven Kreiger's stock certificate and insisted on adding new conditions to the transactions. On Monday, February 4, 2013, Mercer sent Caproni and Koenig a letter formally declaring Steven Kreiger to be in default of the Agreement.

On the other hand, Caproni stated that the February 1, 2013 closing did not occur because Bonds never tendered payment and thus did not perform under the Agreement. Kreiger contends that they left the closing only after the situation reached

a deadlock and it became apparent to everyone that the parties' differences could not be worked out.

*Second Scheduled Closing*

Kreiger further asserts that Bonds' default allowed Steven Kreiger to exercise his contingent right under the Agreement to buy Bonds' SCC shares. In fact, on February 1, 2013, prior to the first scheduled closing, Caproni notified Bonds' counsel by e-mail, that "[i]f your client fails to perform at 2:00 PM today, be advised that Mr. Kreiger is ready, willing and able to acquire Mr. Bonds' stock at 2:00 PM on Monday, February 4, 2013, with closing to occur in my office." According to Caproni, that closing occurred in his office at the stated time. Neither Bonds nor any representative on his behalf attended that closing. Only Steven Kreiger, Suzanne Kreiger, and Caproni were present. And exercising the power of attorney granted under the Agreement,[8] Steven Kreiger signed the documents on behalf of Bonds transferring Bonds' shares to Steven Kreiger. Those documents, along with cashier's checks totaling $350,020, were sent by Federal Express to Mercer, as attorney for

---

[8] The Agreement provided that each shareholder expressly appointed "the other as the appointing party's agent and attorney in fact for the purpose of executing and delivering any and all documents necessary to convey the appointing party's [shares] pursuant to [Section 4.]"

13

Bonds for next day delivery. Caproni noted that February 4, 2013 was the 60th day after the December 6, 2012 offer, and he asserted that it marked the day the original offer expired. However, Bonds rejected and returned Kreiger's tender of the certified checks and documents purporting to transfer Bonds' shares to Steven Kreiger.

*Lawsuit*

Subsequently, on February 11, 2013, Bonds filed a "Complaint for Appointment of Receiver, Declaratory Judgment, and Injunctive Relief" against Steven Kreiger and SCC seeking, inter alia, specific performance of the Agreement. Steven Kreiger filed an answer and counterclaim, asserting claims for breach of contract/specific performance; breach of fiduciary duty and violation of standard of care; an accounting; injunctive relief and the appointment of a receiver; interest; and attorney fees.

The parties filed cross-motions for summary judgment, and the trial court found in favor of Bonds, granting his motion for summary judgment on his claim of specific performance and denying Steven Kreiger's motion. The trial court found as a matter of law that Steven Kreiger breached the Agreement and waived tender by imposing additional conditions for the closing and "generally indicating that he was unwilling to close." The trial court also found that the doctrine of unclean hands did not bar

14

Bonds' specific performance claim because the money from the LOC was returned prior to the closing, and "there is no set of facts under which the LOC could have been used to purchase [Steven Kreiger's] shares and [Steven Kreiger] would have remained personally liable on the LOC." The trial court also held that Steven Kreiger's counterclaims for breach of contract and breach of fiduciary duty failed because Steven Kreiger failed to show how he was damaged by Bonds' actions.

1. Steven Kreiger asserts that the trial court erred in ordering specific performance of sale of his shares to Bonds. He also asserts that the trial court erred in denying his motion for summary judgment on his own claim for specific performance of his purchase of Bonds' shares.

"A party seeking specific performance of a contract must show substantial compliance with his part of the agreement in order to be entitled to a decree." (Citation and punctuation omitted.) *Simprop Acquisition Co. v. The L. Simpson Charitable Remainder Unitrust*, 305 Ga. App. 564, 566 (1) (b) (699 SE2d 860) (2010). See also *Clark's Super Gas, Inc. v. Tri-State Systems, Inc.*, 129 Ga. App. 650, 651 (200 SE2d 472) (1973) (burden is on plaintiff to show compliance with the conditions of the contract). And the breach of a material condition of the contract

15

generally will bar specific performance. *Saine v. Clark*, 235 Ga. 279, 280 (219 SE2d 407) (1975).

Moreover, Georgia law generally requires that "in order to be entitled to a decree of specific performance, a purchaser must make an unconditional tender of the purchase money due." *Fox Run Properties, LLC v. Murray*, 288 Ga. App. 568, 573 (2) (b) (654 SE2d 676) (2007). This requirement places the burden on the purchaser to prove that "he was able to produce the cash necessary to close the transaction in accordance with the terms of the contract." *Haislip v. Garber*, 155 Ga. App. 94, 94 (270 SE2d 237) (1980) (finding no tender occurred where buyer *admitted* that he had no ability to tender the purchase price and that his only means of closing was to gain control of the stock before payment). "[T]here must be an actual, present bona fide offer to pay; and such requirement is not met by merely evidencing a willingness to pay, or by an offer or intention to make a tender." (Emphasis omitted.) *Jolly v. Jones*, 201 Ga. 532, 532 (2) (40 SE2d 558) (1946). "A tender properly made is equivalent to performance, and coin need not be actually presented unless demanded. . . . [W]hile strictly speaking a check is not legal tender, if the creditor accepts same and makes no objection to the specie of payment, this constitutes a waiver of the form of tender." *Brock v. Baker*, 128 Ga. App. 397, 398 (1) (196 SE2d 875) (1973). See also *Weldon*

16

*v. Trust Co. Bank of Columbus*, 231 Ga. App. 458, 460 (1) (499 SE2d 393) (1998) (discussing difference between personal checks and cashier's checks). However, "tender is excused or waived where the seller, by conduct or declaration, proclaims that if a tender should be made, acceptance would be refused. The law does not require a futile tender or other useless act." (Citations omitted and punctuation omitted.) *Fox Run Properties*, 288 Ga. App. at 573 (2) (b). See also *Leggett v. Todd*, 110 Ga. App. 41, 45-46 (5) (137 SE2d 742) (1964) (formal tender not required where party to whom tender is made responds with an unqualified refusal to perform).

Additionally, Georgia law prevents a party who is guilty of unclean hands from obtaining the equitable relief of specific performance. Under OCGA § 23-1-10, "[h]e who would have equity must do equity and must give effect to all equitable rights of the other party respecting the subject matter of the action." The unclean hands doctrine "has reference to an inequity which infects the cause of action so that to entertain it would be violative of conscience. It must relate directly to the transaction concerning which complaint is made. The rule refers to equitable rights respecting the subject-matter of the action. It does not embrace outside matters." (Citations omitted.) *Hampton Island, LLC v. HAOP, LLC*, 306 Ga. App. 542, 546 (3) (702 SE2d 770) (2010).

17

Bonds opted to purchase Steven Kreiger's 27,500 shares after Kreiger triggered the put/call provision of the Agreement. Thus, to perform under the Agreement, Bonds was required to tender "duly executed" documents for conveying the shares and make "appropriate arrangements" for the payment of the purchase price. Additionally, the offer was for payment in cash and required that Bonds indemnify Steven Kreiger against any loss, claim, or damage arising out of any guaranty of any debt of SCC borrowed money.

The testimony is undisputed that none of the documents presented at closing were signed, including the release of Kreiger from his guaranty of the LOC and the check for the purchase price. And the evidence is in conflict as to whether or how the check was presented to Kreiger. Moreover, in order to raise the funds for the purchase price, Bonds granted CLV a security interest in and security title to his SCC shares as collateral for the CLV Loan, and that interest and title had attached the day of the first closing. It is undisputed that CLV is not a "lending institution regularly engaged in the business of making loans" as required under the Agreement, because this was the only loan the CLV had ever made. Additionally, evidence exists to suggest that Bonds planned to meet his obligations under the CLV Loan with corporate funds and credit and not his own funds. In fact, two days before the closing, Bonds caused

18

corporate funds to be transferred to Harrison's trust account to fund the purchase, although these funds were later returned. Nevertheless, Harrison stated that he was willing to fund the purchase price at the time of the closing and raised an unsigned check in the air. The record also shows that Steven Kreiger's representatives did not have his stock certificate at the closing and imposed additional conditions not contemplated by the Agreement shortly before the closing. Kreiger also was the first to leave the closing.

Therefore, we find that numerous fact issues remain in this case, including whether Bonds made the requisite tender of the necessary documents and payment; whether the form of payment purportedly tendered conformed with the Agreement's and the offer's requirement of "cash"; whether Bonds made "appropriate arrangements" for the payment of the purchase price; whether Bonds' execution of the CLV Loan documents constituted a breach of the Agreement and, if so, whether the breach was material; whether Kreiger had the right to impose additional conditions in response to Bonds' prior attempt to use corporate credit to fund the purchase; whether Kreiger's actions signaled an intent not to proceed with the transaction, thus breaching the Agreement and/or waiving tender; and whether Bonds' actions in attempting to fund the purchase with corporate funds violated the

Bylaws and the Agreement, thus constituting unclean hands barring his specific performance claim. Accordingly, we find that the trial court erred in granting Bonds summary judgment on that claim.

2. For the same reasons, we find that the trial court properly denied Steven Kreiger's motion for summary judgment on Bonds' claim and on his own claim for specific performance. In addition to the issues previously noted, we find that issues of fact exist as to whether Steven Kreiger's conditional right to buy Bonds' shares was triggered by the failure of the first scheduled closing or whether Bonds had additional time to perform under the Agreement (i.e., up until ten days after his written exercise of the offer to buy Steven Kreiger's shares or until February 7, 2013); or whether Bonds waived any such additional time by failing to schedule another closing within the requisite period.[9]

*Judgment affirmed in part and reversed in part. Barnes, P. J., concurs. Ray, J., concurs in judgment only*.

---

[9] To the extent that Steven Kreiger also enumerated error in the trial court's denial of his motion for summary judgment on Bonds' claim that he improperly used his power of attorney to purchase Bonds' stock, we deem such error abandoned because he failed to present any argument or authority on this issue. See *EZ Green Assoc., LLC v. Georgia-Pacific Corp.*, 331 Ga. App. 183, 190 (3), n. 26 (770 SE2d 273) (2015); Court of Appeals Rule 25 (2).