A97A2366. WELDON et al. v. TRUST COMPANY BANK OF COLUMBUS, N.A.
(499 SE2d 393)

BEASLEY, Judge.

This case presents for decision questions concerning the circumstances under which payment on a cashier's check may be stopped by either the bank issuing the check or the remitter, who is one who purchases a cashier's check payable to another party. Numerous Code sections within Articles 3 and 4 of the Uniform Commercial Code come into play. OCGA § 11-3-101 et seq. The new versions of these Code sections, rewritten in 1996 (Ga. L. 1996, p. 1306 et seq.), are not considered because the transactions at issue occurred earlier.

Ann Weldon and her son James sued the Trust Company Bank of Columbus for breach of contract and conversion due to the bank's payment of a cashier's check notwithstanding its acceptance of a stop-payment order by Ms. Weldon, the purchaser of the check. The Weldons appeal the trial court's grant of the bank's motion for summary judgment.

Ann Weldon maintained an account at Trust Company Bank.

James Weldon, a garment broker, purchased textile goods from Sportswear Services, Inc. (Sportswear), an out-of-state corporation, for resale to another out-of-state corporation known as Thicket Textiles, Inc. (Thicket). Sportswear informed James Weldon that it would have to receive certified funds before shipping the goods. Weldon testified that, upon inquiry, he was informed by Trust Company Bank officer Sweat that if the goods were purchased by cashier's check, payment could be stopped if the merchandise delivered was not as represented.

On March 23, 1995, a $16,319.29 cashier's check payable to Sportswear was purchased by Ms. Weldon with the funds deposited into her account by her son. The check was mailed to James Weldon's agent, Carr. On March 27, Carr delivered the check to Sportswear, and the goods were shipped by Sportswear to Thicket. The next day Weldon telephoned Sweat to request stop payment on the cashier's check because the goods were defective. Sweat testified that he agreed to stop payment if Ms. Weldon would sign the required paperwork.

Ms. Weldon went to the bank on March 29 and signed a pre-printed indemnification agreement, whereupon the bank debited a $25 stop-payment fee from her account. James Weldon notified Sportswear on March 31 that a stop payment had been issued. On or about April 5, Trust Company Bank received a communication from Sportswear's out-of-state bank regarding the stop payment. Although Trust Company Bank had initially dishonored the cashier's check, it paid it after being informed the check had been delivered to Sportswear, which had released the goods in reliance on the check and had presented the check for payment. The $25 stop-payment fee was credited back to Ms. Weldon's account.

According to Sweat, Ms. Weldon represented to him that the cashier's check had not been delivered to Sportswear and would be returned, and he testified he would not have agreed to issue the stop-payment order had he known the check was delivered. James Weldon testified that on March 28 he informed Sweat that Sportswear was in possession of the check, but Sweat testified that Weldon told him Carr had the check.

The court granted the bank's motion for summary judgment on the following grounds: (1) Neither the bank nor Ms. Weldon could stop payment on the cashier's check because it was the same as payment in cash and, therefore, performance of any stop-payment agreement between Ms. Weldon and the bank is excused; (2) Any such agreement cannot be enforced because of mutual mistakes as to who had the check and whether it was going to be returned; (3) The Weldons have no cause of action for conversion because the proceeds of Ms. Weldon's personal check became the property of the bank once

the check was converted into a cashier's check.

1. The first issue concerns the efficacy of Ms. Weldon's order to stop payment on the cashier's check.

There are essentially two classes of checks.[1] First, there are ordinary personal checks.[2] Such checks do not operate as an assignment of funds,[3] and the drawee is not liable on them until they are accepted[4] or paid.[5] Cashier's checks, certified checks, and bank drafts compose the second class of checks and are collectively known as bank checks.[6] A cashier's check is a check drawn by a bank on itself.[7] A bank draft is a check drawn by one bank on another bank.[8] A certified check is a personal check that a bank has accepted;[9] acceptance of the check operates as an assignment of funds to the payee.[10]

Under OCGA § 11-4-303 (1), any stop-order received by a payor bank comes too late if the stop-order is received or served and a reasonable time for the bank to act on it expires "after the bank has done any of the following: (a) Accepted or certified the item; (b) Paid the item in cash; (c) Settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing-house rule, or agreement. . . ."

*Wright v. Trust Co. of Ga.*, 108 Ga. App. 783, 786 (3) (134 SE2d 457) (1963), espoused the view that a cashier's check is the equivalent of a certified check.[11] This view has been adopted by a majority of courts but by only a minority of commentators. The courts treat both cashier's checks and certified checks the same, because of the prevalent commercial understanding that both are cash equivalents.[12]

The commentators have criticized this view on grounds that although the UCC provides a special role for certified checks, it does not accord cashier's checks a similar status; that a cashier's check is nothing more than a negotiable instrument issued by a bank; that the bank, as the drawer and drawee, can stop payment; and that, as

---

[1] See Lawrence, Making Cashier's Checks & Other Bank Checks Cost-Effective: A Plea for Revision of Articles 3 and 4 of the Uniform Commercial Code, 64 Minn. L. Rev. 275, 278 (1980).

[2] Id.

[3] OCGA § 11-3-409 (1).

[4] Id.

[5] OCGA § 11-4-213 (1) (a).

[6] See Lawrence, supra.

[7] *Harris v. Hill*, 129 Ga. App. 403, 405 (1) (199 SE2d 847) (1973).

[8] *Fulton Nat. Bank v. Delco Corp.*, 128 Ga. App. 16 (1) (195 SE2d 455) (1973).

[9] OCGA § 11-3-411 (1).

[10] OCGA § 11-3-409 (1).

[11] Lawrence, supra at 286. See McDonnell, Freedom from Claims & Defenses: A Study in Judicial Activism under the Uniform Commercial Code, 17 Ga. L. Rev. 569, 613-620 (1983).

[12] McDonnell, supra.

against a non-holder in due course, the UCC allows for the assertion of claims and defenses.

Cases subsequent to *Wright* hold that a cashier's check is accepted in advance by the act of its issuance[13] and operates as an assignment of funds to the payee.[14] Thus, under OCGA § 11-4-303 (1) (a), Ms. Weldon's stop-payment order came too late. When the money was withdrawn from her account and the cashier's check was issued in Sportswear's name, it became Sportswear's property. She could not recall the cashier's check or stop payment on it.[15]

Although technically payment on the cashier's check could not have been stopped after it had been issued, as a practical matter no impediment to stopping payment existed if the check had not been delivered to Sportswear. But Ms. Weldon placed the stop-payment order after the check had been delivered. Under OCGA § 11-3-202 (1), delivery of the cashier's check to the payee resulted in its negotiation. In pertinent part, OCGA § 11-3-202 (1) states that "[n]egotiation is the transfer of an instrument in such form that the transferee becomes a holder."

2. The next question concerns the position the bank would have occupied had it voluntarily honored Ms. Weldon's stop-payment order.

(a) *Wright*, supra at 788-789 (3), recognized the "general view . . . that where the instrument (be it a check, bill of exchange, note, or whatever) is in the hands of the original payee, where no holder in due course is involved, where the payee has not suffered any detriment or changed his position because of reliance on the instrument, the bank may properly defend itself on the basis of mistake and want of consideration."

In *Wright*, the bank customer issued his personal check to the payee, the payee obtained the bank's certification of the check, and the bank allowed the payee to convert the certified check into cashier's checks because of an error in not flagging the customer's account with a stop-payment order the customer placed on his personal check before it was certified. The consideration given by the bank for the cashier's check failed, because it had no right to charge its customer's account. *Wright* held that the bank could stop payment.[16]

*Wright* is distinguishable in that payment on Ms. Weldon's personal check was not stopped. Consequently, the bank properly charged Ms. Weldon's account and the consideration given by Trust

---

[13] *Harris*, supra, 129 Ga. App. at 406.
[14] *Fulton Nat. Bank*, supra, 128 Ga. App. at 18.
[15] *Harris*, supra, 129 Ga. App. at 407.
[16] *Wright* was followed in *Intl. Furniture Distributors v. First Ga. Bank*, 163 Ga. App. 765 (294 SE2d 732) (1982).

Company Bank for the cashier's check to Sportswear did not fail. Had the bank dishonored the check and then been sued by Sportswear, it would have had no defense in its own right.[17]

Ms. Weldon could have been impled in an action by Sportswear against the bank pursuant to the indemnification agreement. In it she covenanted and agreed to indemnify and save the bank harmless from any liability and expense it might incur on account of causing the dishonor of the check if presented for payment. Had she been impled, OCGA § 11-3-306 would have governed. Under it a person not having the rights of a holder in due course takes the instrument subject to: "(a) All valid claims to it on the part of any person; and (b) All defenses of any party which would be available in an action on a simple contract. . . ."

Even if Sportswear was not a holder in due course,[18] the Weldons could not have asserted a claim to the proceeds of the cashier's check; the check operated as an assignment of funds to Sportswear. Compare *Fulton Nat. Bank*, supra.[19] There, the bank customer delivered a bank draft to the payee. At the customer's request, the bank that had issued the draft stopped payment on it. It was held that the bank had a right to do this and that the customer, as a party to the action, could assert a claim to the proceeds of the draft. In so holding, the court distinguished a bank draft from a cashier's check, noting that a bank draft does not operate as an assignment of funds "as does a certified check . . . or a cashier's check."[20] The commentators are of the opinion that the result in *Fulton Nat. Bank* should be the same where a cashier's check is involved.[21] This is based on a view rejected by Georgia courts.[22]

In addition, the Weldons could not have asserted a defense, for they were not parties to the cashier's check. A remitter, such as Ms. Weldon, is not a party to the instrument. See *Fulton Nat. Bank*, supra, 128 Ga. App. at 18 (2).

(b) There is no merit in the Weldons' argument that they had a

---

[17] Cf. *C & S Nat. Bank v. Youngblood*, 135 Ga. App. 638 (219 SE2d 172) (1975). In *Youngblood*, the payee of a personal check converted it into a cashier's check by the drawee bank, and the drawer later placed a stop-payment order on the personal check. The bank honored the stop-payment order and then sued the payee to recover the proceeds of the cashier's check. This Court held that the stop-payment order came too late, and the bank erred to its prejudice by not so informing its customer.

[18] It can be argued that Sportswear was not a holder in due course, since it took the cashier's check with notice that the check was in payment of defective goods. See OCGA § 11-3-302 (1) (c). Even so, Sportswear did "change [its] position because of reliance on the instrument." *Wright*, supra, 108 Ga. App. at 789.

[19] 128 Ga. App. at 18 (2), (3).

[20] 128 Ga. App. at 18.

[21] See 2 Uniform Commercial Code, Sumner & White, Ch. 21-5, p. 390 (4th ed.).

[22] See n. 10.

right under OCGA § 11-4-303 (1) (c) to stop payment on the cashier's check, in that Sweat's representation that Weldon could stop payment if the goods were defective amounted to a settlement of the item with reservation of a right to revoke settlement.

Weldon testified that Sweat made this representation to him prior to Ms. Weldon's purchase of the cashier's check. The stop-payment order was not placed until after the cashier's check was issued. Even if Sweat and Weldon reached an earlier agreement that settlement of the cashier's check could be revoked, payment could not be stopped after the check was issued. OCGA § 11-4-303 (1) states that a stop order comes too late after the bank has done "any of the following." Moreover, insofar as the rights of the payee of a check are concerned, the question under § 11-4-303 (1) (c) is whether the bank informed the payee of a right to revoke settlement, not whether it informed the drawer or purchaser.

3. The Weldons contend the court erred in granting summary judgment on the question of whether the indemnification agreement was entered into under a mutual mistake as to the whereabouts of the cashier's check. They argue that Weldon's testimony that Sweat was aware that the check had been delivered to Sportswear, and certain statements in the indemnification agreement, create a conflict in the evidence. The statements referred to are found in Sweat's hand-written notation following the pre-printed language of the indemnification agreement: "Recipient [Sportswear] misrepresented merchandise for sale. Check is to be returned, however, receipt of check is uncertain at this time." In the agreement's pre-printed language, Ms. Weldon swore the check had not been endorsed or negotiated.

Any such conflict is not material. If, as maintained by the Weldons, the parties entered into the agreement with knowledge it had been delivered to the payee, then both parties were obviously laboring under the mistaken belief that payment on the check lawfully could be stopped. In this event, the agreement would be unenforceable because it was founded on a mutual mistake of law. "If the consideration upon which a contract is based was given as a result of a mutual mistake of fact or of law, the contract cannot be enforced." OCGA § 13-5-4.

4. The final question is whether the bank was entitled to summary judgment on the Weldons' conversion claim. The answer is "yes."

The rule is that once money is withdrawn from a bank customer's account and a cashier's check is issued in the payee's name, the check becomes the payee's property.[23] " 'Conversion is the

---

[23] *Harris*, supra.

unauthorized assumption and exercise of the right of ownership over personal property *belonging to another* which is contrary to the owner's rights. (Cit.)' [Cit.]"[24] Unavailing is the Weldons' argument that they have a claim for conversion because the bank initially dishonored the cashier's check. There is no evidence the funds represented by the check were ever credited back to Ms. Weldon's account.

*Judgment affirmed. McMurray, P. J., and Smith, J., concur in Divisions 1, 2 (b), 3 and in the judgment only as to Divisions 2 (a) and 4.*

DECIDED MARCH 20, 1998.

*Gambrell & Stolz, Alvin T. Wong, Hoke J. Thomas, Jr.,* for appellants.

*Hatcher, Stubbs, Land, Hollis & Rothschild, Theodore D. Morgan, J. Barrington Vaught,* for appellee.

[24] (Emphasis supplied.) *Rush v. Farmers &c. Bank*, 162 Ga. App. 65 (290 SE2d 164) (1982).
[1] 218 Ga. App. 701 (463 SE2d 152) (1995).
[2] 220 Ga. App. 906 (472 SE2d 308) (1996).