**FIFTH DIVISION**
**RICKMAN, C. J.,**
**MCFADDEN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**February 4, 2022**

# In the Court of Appeals of Georgia

A21A1574. MOXIE CAPITAL, LLC v. DELMONT 21, LLC et al.

PHIPPS, Senior Appellate Judge.

Moxie Capital, LLC ("Moxie") appeals from the superior court's Order and Final Judgment adopting a special master's findings and awarding Delmont 21, LLC ("Delmont") fee simple title to two parcels of property after Moxie failed to properly redeem the properties from Delmont, the purchaser of the properties' tax deeds. Moxie argues that the superior court erred in finding that (1) its tender of personal checks pursuant to its attempt to redeem the properties was not a valid tender under OCGA §§ 48-4-42 and 48-4-44 (c), (2) other than accepting a statutorily proper tender, a tax deed holder has no duty to cooperate in a reasonable manner with a party seeking redemption of properties under the tax deed redemption statutes; and (3) no genuine issues of material fact exist surrounding Delmont's alleged obstruction of

Moxie's redemption effort and whether such actions by Delmont constituted a waiver of the tender requirements, including the form of tender. For the following reasons, we affirm the superior court's final judgment.

At the outset, we note that Moxie's appellate briefs do not comply with this Court's rules in a number of respects. Notably, many of the factual recitations do not contain proper citations to the specific page numbers of the record or transcript that are essential to consideration of the enumerated errors. See Court of Appeals Rule 25 (a) (1), (c) (2) (i). Factual representations contained in the parties' briefs that are unsupported by evidence of record cannot be considered in the appellate process. See *Crewe Acquisitions v. Kendrick*, 351 Ga. App. 624, 626, n. 5 (832 SE2d 442) (2019). In addition, Moxie's briefs include numerous conclusory legal statements and arguments devoid of any citation of authorities – or citation to *relevant* authorities – in violation of Court of Appeals Rule 25 (a) (3).

Briefs that do not conform to our rules hinder our ability to determine the basis and substance of an appellant's appeal. *Williams v. State*, 318 Ga. App. 744, 744-745 (734 SE2d 745) (2012). In addition, "[t]he burden is upon the party alleging error to show it affirmatively in the record," and "[a]ppellate judges should not be expected to take pilgrimages into records in search of error without the compass of citation and

argument." *Bennett v. Quick*, 305 Ga. App. 415, 416 (699 SE2d 539) (2010) (citations and punctuation omitted). Here, many of Moxie's appellate claims are unsupported by argument or citations to relevant authority, and those claims, therefore, may be deemed abandoned. See Court of Appeals Rule 25 (c) (2); *Bennett*, 305 Ga. App. at 416-417.

Nonetheless, we turn to the relevant facts and merits of this appeal, as best as we can discern them. The facts this Court can confirm show that in October 2017, Theodore Jackson, as Sheriff of Fulton County, conducted tax sales on behalf of Reginald Jackson, as trustee for 0 Moreland Trust, involving two parcels of property in Atlanta. Delmont acquired the fieri facias tax liens on the properties and recorded tax deeds on November 9, 2017. After the one-year period following the tax sales, Delmont began foreclosing on the right to redeem the properties from the tax sales pursuant to OCGA § 48-4-45 by publishing notices in the Fulton Daily Report. The notices tracked the statutory language in OCGA § 48-4-46, stating that "[t]he property may be redeemed any time before November 20, 2018 by payment of the redemption price as fixed and provided by law to the entity listed below at the following address: Delmont 21, LLC[,] PO Box [XXXXXX,] Atlanta, GA 30342."

During the afternoon of November 19, 2018, the last day for redemption of the properties subject to the tax deeds, Moxie purchased fee simple title to the properties (and, as a result, the right to redeem the properties subject to the tax deeds) from Reginald Jackson. Moxie's manager, Thomas Hills, purportedly recorded the warranty deeds immediately after closing and both called and texted Delmont via its manager, Thomas Murtaugh, beginning at 1:55 p.m. to obtain the payoff amounts and options for delivery of the payoff. Murtaugh testified by deposition that he was in a real estate closing on the afternoon when Hills attempted to contact him. Murtaugh returned Hills's first call at 2:03 p.m., but the return call went unanswered. When Murtaugh failed to respond to other calls and texts, Hills arranged an evening delivery to Murtaugh's home address of two personal checks on the account of Bonneau H. Dickson, Jr., a member of Moxie but a non-party to the transactions. Delmont subsequently returned Dickson's checks to Hills, indicating they were "a legally insufficient tender."

On December 3, 2018, Moxie petitioned to quiet title and for a restraining order, an accounting on and cancellation of a security deed as to both properties, attorney fees and punitive damages for willful tort (obstruction of the right of redemption), and recovery of excess bid funds from the tax sales. Moxie amended its

4

petition several times, and specifically requested the appointment of a special master. Delmont answered, counterclaimed to quiet title, and also requested the appointment of a special master. The superior court thereafter appointed a special master, and later issued a second order giving the special master authority to determine the parties' quiet title claims.

Delmont filed a motion for summary judgment, which it subsequently amended. Moxie also filed a motion for partial summary judgment on its quiet title claim.

The special master held a hearing, made numerous factual findings and conclusions of law, and issued a report on May 1, 2020, recommending that Moxie's motion for partial summary judgment on its quiet title claim be denied and that Delmont's motion for summary judgment on Moxie's quiet title claim be granted. The special master, however, recommended in this particular report that Delmont's motion for summary judgment on its counterclaim for quiet title be denied because Delmont had failed to introduce evidence showing that it complied with the tax deed foreclosure statutes. As to the merits of the quiet title claims, the special master found that Moxie's tender of personal checks was insufficient tender under Georgia law. Further, the special master implicitly found that, contrary to Moxie's argument,

Delmont did not act in bad faith when Murtaugh failed to respond to Moxie's calls and texts on the afternoon of November 19, 2018. According to the special master,

> Tom Hills for the Petitioner[,] knowing that the address to present the proceeds was a p.o. box and knowing the statutory scheme for calculating the proceeds, waited until the afternoon of the deadline to present the proceeds [and] to contact Respondent Delmont to discuss the amount[] and how to deliver the proceeds. Petitioner argues that Respondent Delmont acted in bad faith in not communicating with Petitioner[, but] Petitioner has not cited to any case law or statute [standing for the proposition] that a holder of a tax deed has to do anything more than what is set out in the statutes for the redemption process. There is no requirement that the holder of the tax deed has to be on standby with the file and the calculated redemption amount on the last day of the [tax deed redemption] process at the expense of the rest of his business activities.

The superior court issued a May 12, 2020 order adopting the special master's report. Moxie thereafter filed "Objections to Special Master Report, Motion to Reject or Modify, Motion for Reconsideration, Motion for New Trial[,] and Motion to Vacate," which the superior court summarily denied on November 9, 2020.[1]

---

[1] Moxie filed a notice of appeal from the special master's May 1, 2020 report, as well as the superior court's November 9, 2020 order denying its objections to the special master's report and related motions. This Court dismissed the direct appeal, noting that the case was still pending in the superior court and, therefore, Moxie was

6

Delmont subsequently filed a motion for entry of a final order and decree of title. Following another hearing, the special master made numerous factual findings and conclusions of law, and she issued a November 30, 2020 report recommending that Delmont's counterclaim be granted and that Delmont be awarded fee simple title to the real property at issue. Specifically, the special master concluded that Murtaugh's affidavits demonstrated that Delmont had complied with the tax deed foreclosure process for the subject properties.

The superior court entered an order and final judgment, adopting the special master's findings and awarding Delmont fee simple title to the properties at issue. Moxie timely appeals from that final order.

1. Moxie asserts that the superior court erred in interpreting OCGA §§ 48-4-42 and 48-4-44 (c) to require that only cash and certified checks are valid tender for tax deed redemptions and, therefore, his tender of personal checks was not valid.[2] We disagree.

---

required to use the interlocutory appeal procedures to appeal at that time. See *Moxie Capital, LLC v. Delmont 21, LLC*, Case No. A21A0962 (dismissed February 11, 2021).

[2] "For convenience of discussion, we have taken the enumerated errors out of the order in which [Moxie] has listed them. . . ." *Foster v. Morrison*, 177 Ga. App. 250, 250 (1) (339 SE2d 307) (1985).

7

Although the rights of property owners are favored in the interpretation of laws governing the enforcement and collection of taxes through the sale of the taxpayer's property, and provisions permitting an owner to redeem his property are liberally construed,

> [u]nder our well-established rules of statutory construction, we presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. In our interpretation of statutes, we thus look to the text of the provision in question, and its context within the larger legal framework, to discern the intent of the legislature in enacting it.

*Reliance Equities, LLC v. Lanier 5, LLC*, 299 Ga. 891, 894 (1) (792 SE2d 680) (2016) (citation and punctuation omitted). This Court must refrain from construing a statute in any way that renders any part of it meaningless and consider the entire scheme of the statute. *Footstar, Inc. v. Liberty Mut. Ins. Co.*, 281 Ga. 448, 450 (637 SE2d 692) (2006). In addition, we must remember that "[t]here is no authority for redeeming property sold for taxes, except that given by statute." *Forrester v. Lowe*, 192 Ga. 469,

8

474 (2) (15 SE2d 719) (1941). With these principles in mind, we turn to the applicable tax redemption statutes.

The right to redeem real property subject to a tax deed is set out in OCGA § 48-4-40, which states in relevant part: "[A]ny person having any right, title, or interest in or lien upon such property may redeem the property from the sale by the payment of the amount required for redemption, as fixed and provided in Code Section 48-4-42." Subsection (d) of OCGA § 48-4-42 mandates that "[a]ll of the amounts required to be paid by this Code section shall be paid in lawful money of the United States to the purchaser at the tax sale or to the purchaser's successors." The question raised in this appeal is whether Moxie's tender of third-party, personal checks constituted a tender of "lawful money." This is a question of law, which we consider de novo. See *McGregor v. River Pond Farm, LLC*, 312 Ga. App. 652, 653 (1) (719 SE2d 546) (2011).

Moxie argues that Georgia statutory law does not define "lawful money" and, therefore, the tender of a personal check can be considered a tender of lawful money. This argument fails because a personal check is considered a "negotiable instrument," rather than lawful money. See OCGA § 11-3-104 (a). Black's Law Dictionary defines "money" as "[t]he medium of exchange authorized or adopted by a government as

part of its currency; esp., domestic currency [–] coins and currency are money." Black's Law Dictionary 1204 (11th ed. 2019). A personal check, on the other hand, is not the equivalent of domestic currency. A personal check is a negotiable instrument – "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order." OCGA § 11-3-104 (a). "A check, executed and delivered, is a contract in writing by which the drawer contracts with the payee that the bank will pay to the payee therein the amount designated on presentation." *Bailey v. Polote*, 152 Ga. App. 255, 256 (1) (262 SE2d 551) (1979). Thus, by its very nature, a personal check constitutes a future promise to pay, rather than "lawful money." See *McEachern v. Indus. Life & Health Ins. Co.*, 51 Ga. App. 422, 427 (180 SE2d 625) (1935) ("It is the general rule that bank checks are not payment until themselves paid, the presumption being that the payee of a check takes it for collection and application rather than as payment in and of itself.") (citation and punctuation omitted).

As this Court previously has observed, a check is a "commercial device intended to be used as a temporary expedient for the actual money," and "a strictly good tender can not be made by the offer of a check for the amount due." *McEachern*, 51 Ga. App. at 427 & 430 (citations and punctuation omitted). In fact, in a case

10

specifically addressing the redemption of tax deeds, the Supreme Court of Georgia held that

> the tender can not be avoided by a promise to pay or an assertion in pleadings of a willingness to pay. One entitled to redeem will not be allowed to hold the purchase-money and at the same time recover the property. He can not have both. If the [tax sale] purchaser must surrender the one, he is entitled at the same time and without delay to receive the other.

*Forrester*, 192 Ga. at 474 (2).

Our determination that "lawful money" – in the context of the tax deed redemption statutes – does not include a personal check is further buttressed by the propositions that OCGA § 48-4-42 (d) "must be construed in relation to other statutes of which it is a part," and that "all statutes relating to the same subject-matter, briefly called statutes in pari materia, are construed together, and harmonized whenever possible, so as to ascertain the legislative intendment and give effect thereto." *Iglesia Del Dios Vivo Columna Y Apoyo De La Verdad La Luz Del Mundo, Inc. v. Downing*, 321 Ga. App. 778, 783 (742 SE2d 742) (2013) (citation and punctuation omitted). Thus, OCGA § 48-4-42 (d)'s reference to "lawful money" must be read together with OCGA § 48-4-44, which addresses the procedure by which the individual redeeming

11

property obtains a quitclaim deed from the tax sale purchaser. According to that statute,

> [i]f the quitclaim deed provided for in subsection (a) of this Code section is presented to the [tax sale] purchaser at the time such person accepts the amount payable for the redemption *in the form of cash or a certified check*, the purchaser shall, at that time, sign the quitclaim deed if a notary public and an unofficial witness are present to witness such signature.

OCGA § 48-4-44 (c) (emphasis supplied).

We agree with the special master that OCGA § 48-4-44 (c) further defines OCGA § 48-4-42 (d)'s reference to "lawful money" as meaning cash or a certified check. Contrary to Moxie's claim, this interpretation of "lawful money" is not unnecessarily narrow and does not disfavor the redemption of property; it simply "permits the language of each section [of the redemption statutes] to be meaningful, brings the sections into harmony with each other, and accords with the intent of the legislature." *Footstar*, 281 Ga. at 451. As with a "for cash" judicial sale, the important feature of "lawful money" "is not the tender of actual hard currency, but rather the tender of immediately available funds instead of the mere promise of future payment." *Upchurch v. Chaney*, 280 Ga. 891, 892 (635 SE2d 124) (2006)

12

(punctuation omitted). And, as this Court previously has noted, there are two classes of checks: (1) ordinary personal checks, which "do not operate as an assignment of funds," as a reult of which "the drawee is not liable on them until they are accepted or paid," and (2) cashier's checks, certified checks, and bank drafts. *Weldon v. Trust Co. Bank*, 231 Ga. App. 458, 460 (1) (499 SE2d 393) (1998) (citations omitted). Unlike a personal check, "[a] certified check is a personal check that a bank has accepted; acceptance of the check operates as an assignment of funds to the payee." Id. (citations omitted). Accordingly, the redemption statutes required Moxie to tender cash or certified checks, where funds are immediately available to cover the payment, rather than personal checks, which carry no such guarantee. See id. If the legislature had wanted another form of tender, such as a personal check, to be an option, then it had the opportunity to specify that in OCGA § 48-4-44 (c), which it did not do. See *Monumedia II, LLC v. Dept. of Transp.*, 343 Ga. App. 49, 55 (1) (806 SE2d 215) (2017) ("both our constitutional system of government and the law of this State prohibit the judicial branch from amending a statute by interpreting its language so as to change the otherwise plain and unambiguous provisions") (citation and punctuation omitted).

13

Likewise, we disagree with Moxie's assertion, unsupported by any citation of authority, that OCGA § 48-4-44 (c) and (d)[3] should be read together as requiring different time frames for the execution of quitclaim deeds depending on the form of tender. Both subsections refer to the necessity of redemption, which, according to OCGA § 48-4-42 (d), is the payment of "lawful money." And both subsections address when a quitclaim deed will be executed. Subsection (d) does not, as argued by Moxie, provide an alternative form of "lawful tender."

As for Moxie's assertion that a personal check is analogous to a cashier's check, that argument has no relevance here, as Moxie has cited no authority for the proposition that a "cashier's check" would have qualified as a valid tender. As stated previously, OCGA § 48-4-44 (c) further defines OCGA § 48-4-42 (d)'s reference to "lawful money" as meaning cash or a *certified* check. Moreover, even if a cashier's check and a certified check could be deemed analogous, which we need not determine in this case, see generally *Harris v. Hill*, 129 Ga. App. 403, 405 (1) (199 SE2d 847) (1973), Moxie's appellate brief clearly recognizes that a personal check is not the

[3] OCGA § 48-4-44 (d) states: "If no quitclaim deed is presented at the time of the redemption or if sufficient witnesses are not present, it shall be the responsibility of the [tax sale] purchaser to prepare and properly execute such quitclaim deed as is required by law within seven days from the date of the redemption."

14

equivalent of a certified check, repeatedly arguing that Delmont's actions prohibited Moxie from obtaining certified funds before a bank closed. Likewise, Moxie refers to a personal check in its appellate brief as an "uncertified check."

Because Moxie failed to properly redeem the properties at issue with "lawful money," Delmont was entitled to fee simple title to the properties.

2. To avoid its failure to tender lawful money to redeem the properties, Moxie attempts to carve out a bad faith exception to the statutory tender requirement. Moxie's enumeration of error frames this argument as follows: "The trial court erred in failing to find that a tax deed holder has no duty to cooperate in a reasonable manner with an interested party seeking to redeem a tax deed." First of all, this argument inaccurately describes the special master's ruling, adopted by the trial court, which implicitly found that Delmont did not act in bad faith under the circumstances of this case. Importantly, the special master's report and the superior court's order do *not*, contrary to Moxie's argument, render a blanket finding that a tax deed holder has

15

no duty whatsoever to cooperate with a party seeking redemption of properties under the tax deed redemption statutes.[4]

Second, Moxie's assertion of error contains conclusory legal statements and arguments devoid of any citations to relevant authority in violation of Court of Appeals Rule 25 (a) (3), and the enumeration of error, therefore, is deemed abandoned. See Court of Appeals Rule 25 (c) (2); *Bennett*, 305 Ga. App. at 416-417.

Regardless, under the circumstances of this case, as more fully detailed below in Division 3, we need not determine at this time whether the redemption statutes include a duty of good faith or an exception for bad faith[5] because, as we conclude in Division 3, the facts detailed by the special master, and adopted by the superior court, are not clearly erroneous and demonstrate that Delmont did not act in bad faith.

---

[4] Although the special master found that "[t]here is no requirement that the holder of the tax deed has to be on standby with the file and the calculated redemption amount on the last day of the [tax deed redemption] process at the expense of the rest of his business activities," this statement regarding the duty of a tax deed holder is not so broad as to preclude *any* duty. In addition, the statement was limited to the facts of this case, where Moxie attempted to contact Delmont two hours before banks closed on the last day of the redemption period.

[5] Indeed, the redemption statutes do not specifically include such a duty or an exception, and it is up to the General Assembly to determine whether such a duty or an exception should be included in the tax deed redemption statutory scheme. See *In re Whittle*, 339 Ga. App. 83, 88 (1) (793 SE2d 123) (2016) (an appellant's policy arguments should be directed to our General Assembly, not an appellate court).

16

3. Moxie argues that issues of material fact exist surrounding Delmont's alleged obstruction of Moxie's redemption effort and whether such obstruction constituted a waiver of the tender requirements, including the form of tender; specifically, Moxie asserts that Delmont's actions constituted bad faith, thereby relieving Moxie of its obligation to make a proper tender. According to Moxie, it made multiple attempts to contact Delmont for a payoff amount and delivery location, but Murtaugh's conduct "thwarted" Moxie's opportunity to obtain a certified check and, therefore, bars Delmont from claiming perfect tender was not accomplished. Moxie asserts that the special master "ignored . . . admissions," "indulged [Delmont's] disingenuous claims," and "overlook[ed] [Delmont's] implausible testimony and admitted obstruction," and that "[t]he trial court erred in ruling that there was no genuine issue of fact [as to whether Delmont's] obstruction of [Moxie's attempted] redemption of its property constituted a waiver of both tender and . . . its objection to the form of tender." Based on the facts in the record and our standard of review, we find that this enumeration of error lacks merit.

When Moxie filed its petition to quiet title, both Moxie and Delmont requested the appointment of a special master, and the superior court appointed a special master

to determine each parties' quiet title claims. After a petition to quiet title is assigned to a special master,

> the special master shall have complete jurisdiction within the scope of the pleadings to ascertain and determine the validity, nature, or extent of petitioner's title and all other interests in the land, or any part thereof, which may be adverse to the title claimed by the petitioner, or to remove any particular cloud or clouds upon the title to the land and to make a report of his findings to the judge of the court[.]

OCGA § 23-3-66; see also OCGA § 23-3-63. The record does not show that either party or the special master requested a jury to try issues of fact regarding the quiet title claim, see OCGA § 23-3-66; therefore, "the special master became the arbiter of law and fact." *McGregor*, 312 Ga. App. at 653 (1) (citation and punctuation omitted).

> Although the special master does not divest the trial court of overall jurisdiction of the case, once the trial court adopts the special master's findings and enters judgment, the court's decision is upheld by the appellate court unless clearly erroneous. Therefore, if there is any evidence supporting the judgment of the trial court, it will not be disturbed.

Id. (citations and punctuation omitted); accord *Nelson v. Ga. Sheriffs Youth Homes, Inc.*, 286 Ga. 192, 193 (686 SE2d 663) (2009).[6]

With this standard of review in mind, we turn to the special master's findings of fact in this case – supported by the record – which establish that Delmont did not act in bad faith under the circumstances presented. The special master found that Moxie

> was aware of the [tax deed redemption] process for the Properties in ample time to be able to run a title search, locate the owner [of] the Properties, bring in an investor to help fund the proceeds needed to pay the amount required to gain the complete title interest in the Properties, buy the Properties from the owner, pay off the 2018 taxes due on the Properties, and research and determine who and how to contact [sic] Respondent Delmont to complete the process to redeem the Properties. Nevertheless, Tom Hills, an attorney and experienced businessman[,] made a business decision to wait until 1:55 p.m. on November 19, 2018 (the last day to pay the redemption proceeds) to try to contact an owner of Respondent Delmont to discuss logistics.

---

[6] Delmont argues that Moxie's failure to include transcripts of the special master's hearings precludes review of her findings in this case. This is incorrect given the procedural posture of the case. Because the summary judgment hearings in this case consisted only of "arguments of counsel" and the special master reviewed the record to determine her findings of fact, and because the superior court adopted those findings of fact and entered judgment on them, this Court will review the findings of fact and uphold the superior court's decision to adopt them unless clearly erroneous. See *McGregor*, 312 Ga. App. at 653 (1); accord *Nelson*, 286 Ga. at 193.

Likewise, the special master specifically found that Moxie "knew that [using] certified funds was the best practice for tender but waited until the afternoon of [the last day to redeem] to contact . . . Delmont . . . to discuss logistics for the process."

These facts were adopted by the superior court and are supported by the evidence in the record as discussed earlier in this opinion. In fact, the manager and part-owner of Moxie admitted in an affidavit that "it was well into the afternoon of November 19, 2018, the very last day on which the properties could be redeemed," when he attempted to obtain the figure for the amount necessary to redeem the properties from the holder of the tax deeds because "[n]egotiations with the fee simple owner of the properties were not easy. Only as the foreclosure of the right to redeem the tax deeds was imminent – the deadline date for tender of the redemption amount – was [Moxie's manager] able to meet with the fee simple owner and close on purchasing the properties." It is further undisputed that the required notices of foreclosure, which complied with the statutory requirements for tax deed foreclosure notices, see OCGA § 44-4-46, indicated where the redemption amount should be

delivered, but Moxie wanted "a way to deliver the redemptions other than through the post office box shown on the notices of foreclosure of right to redeem."[7]

In addition, the special master implicitly found that Delmont did not operate in bad faith based on Murtaugh's actions. Again, this finding was adopted by the superior court and is supported by the evidence in the record. For example, it is undisputed that Murtaugh returned Moxie's call at 2:03 p.m., according to Moxie's call log, but Moxie's manager did not answer the call. And it is further undisputed that Murtaugh was in a real estate closing on the afternoon when Moxie attempted to contact him. Contrary to Moxie's argument, there is nothing in the redemption statutes stating that a tax deed holder has "no right to schedule conflicts against the [tax deed redemption] period."

---

[7] Moxie argues that delivering cash or a certified check to a post office box before the tax deed redemption deadline is a "troublesome matter of logistics and confirmation." However, the Supreme Court of Georgia has held that mailing certified funds to a post office box address before the deadline complies with OCGA §§ 48-4-45 and 48-4-46. *Southerland v. Bradshaw*, 252 Ga. 294, 296 (2) (313 SE2d 92) (1984). Although this Court, like the special master, is sympathetic to Moxie's argument, it is the General Assembly that must change the law if more regulation and guidance is warranted in tax deed redemption and foreclosure procedures. See *In re Whittle*, 339 Ga. App. at 88 (1) (an appellant's policy arguments should be directed to our General Assembly, not an appellate court).

Moreover, while Moxie asserts that Delmont's failure to communicate for "two hours from the time of the first call and Murtaugh's initial return call" prohibited it from obtaining certified checks before banks closed "approximately 115 minutes" later,[8] the parties do not dispute that Moxie timely delivered to Murtaugh's house the proper amount to redeem the properties, and Moxie, which bears the burden as the appellant, has cited no record evidence supporting the proposition that it could not have obtained certified checks (in the same amount as the personal checks it in fact presented in its attempted tender) before all reasonably available banks closed on November 19, 2018. See *Bennett*, 305 Ga. App. at 416 ("The burden is upon the party alleging error to show it affirmatively in the record.") (citation and punctuation omitted). The fact that Murtaugh was unavailable while conducting business during this two-hour period does not indicate that Delmont "thwarted" Moxie's efforts to redeem the properties. In fact, the record supports a finding of fact that Moxie's failure to properly tender "lawful money" was due to its own actions and inaction; specifically, (1) Moxie's failure to ascertain the amounts necessary to redeem the

---

[8] For purposes of this appeal, we are assuming, without deciding, that Moxie's statement regarding bank closing times is accurate. Moxie has not provided any support for this statement, but we do know that Hills began calling Murtaugh at 1:55 p.m. and that Murtaugh returned the call – although his response went unanswered – at 2:03 p.m.

properties earlier than two hours before banks closed on the last day to redeem, especially given the fact that the notices of foreclosure indicated that the redemption amounts were to be sent to a post office box, (2) Moxie's failure to answer Murtaugh's phone call earlier in the afternoon, and (3) Moxie's failure to obtain certified checks, even though it timely delivered personal, non-party checks for amounts which the parties do not dispute were appropriate. Accordingly, pretermitting whether the redemption statutes permit a bad faith defense, because there is evidence supporting Delmont's lack of bad faith under the circumstances of this case, "the special master's finding . . . and the trial court's judgment adopting that finding [are] not clearly erroneous." *Steinichen v. Stancil*, 284 Ga. 580, 582 (669 SE2d 109) (2008).

Contrary to Moxie's assertion, *Mark Turner Properties v. Evans*, 274 Ga. 547 (554 SE2d 492) (2001), and *Burnam v. Wilkerson*, 217 Ga. 657 (124 SE2d 389) (1962), do not require a different result. In *Mark Turner Properties*, the Supreme Court of Georgia held that when a tax deed holder "refuses by her conduct to accept any amount, the refusal dispenses with the formality of making a legal tender." 274 Ga. at 550 (3); accord *Burnam*, 217 Ga. at 662-663 (4) (an individual cannot refuse to accept tender by avoiding contact with a payor). A similar conclusion was reached

23

in *Forrester v. Lowe*, 192 Ga. at 474 (2): "Of course, if payment is refused by the [tax sale] purchaser when legally tendered, such tender would satisfy the statutory requirement of payment." As emphasized in *Forrester*, however, "the tender can not be avoided by a promise to pay or an assertion in pleadings of a willingness to pay." Id. In this case, unlike the cases cited by Moxie, the parties do not dispute that Moxie attempted to tender the appropriate redemption amounts and that Murtaugh (or someone in his household) was present to receive the attempted tender; however, as we found in Division 1, Moxie's attempted tender was not a tender of "lawful money," but merely a promise to pay.

Based on the foregoing, the superior court did not clearly err in adopting the special master's findings of fact and awarding Delmont fee simple title in the properties at issue. See *McGregor*, 312 Ga. App. at 653 (1). The evidence in the record establishes that Moxie failed to tender "lawful money" prior to the end of the redemption period and that, given the circumstances in this case, that failure was not due to any bad faith on the part of Delmont.

*Judgment affirmed. Rickman, C. J., concurs; and McFadden, P. J., dissents.*

A21A1574. MOXIE CAPITAL, LLC v. DELMONT 21, LLC et al.

McFADDEN, Presiding Judge, dissenting.

The ultimate question in this case is forfeiture. Under our tax lien statutes, a third party can acquire title to real property simply by paying the past-due taxes on it. See OCGA § 48-4-1 et seq.; see also *Brown Investment Group v. Mayor & Aldermen of the City of Savannah*, 303 Ga. App. 885, 886 (695 SE2d 331) (2010).

Delinquent taxpayers have a time-limited right to redeem their title; but once that time expires, their right of redemption is forfeit — along with whatever equity they had in the property. See OCGA §§ 48-4-40, 48-4-45; see also *Nat. Tax Funding v. Harpagon Co.*, 277 Ga. 41, 43 (2) (586 SE2d 235) (2003); *Brown*, 303 Ga. App. at 886 (the tax deed acquired by a third party at a tax sale conveys "an inchoate or defeasible title, subject to the right of the owners, the defendants in fi. fa., to redeem within the time prescribed by OCGA § 48-4-40") (citation and punctuation omitted).

"It is well settled that because the forfeiture of the right of redemption is so harsh, the law favors the redeeming property owner. As such, the laws of this state governing the right to redeem are to be construed liberally and most favorably to persons allowed by the statute to redeem." *H & C Dev. v. Bershader*, 248 Ga. App. 546, 548 (1) (546 SE2d 907) (2001) (citations and punctuation omitted).

The particular issue before us entails construction of an expression that is used in our tax lien statutes, but which the General Assembly has not expressly defined: "lawful money of the United States." The majority defines that expression illiberally — to exclude payments made by personal check. The majority's definition is contrary to the precept set out in *H & C Dev.*

2

And it is wrong for other reasons as well. Elsewhere in Title 48 (Revenue and Taxation) our General Assembly so uses "lawful money of the United States" as to make clear that it includes personal checks.

In addition, the majority's reliance on the Uniform Commercial Code is misplaced. The statutes we are construing predate the UCC. And the UCC does not contain the purported distinction on which the majority relies: personal checks and certified checks are both negotiable instruments.

Also misplaced is the majority's reliance on the requirement of payment "in the form of cash or a certified check" in OCGA § 48-4-44 (c). Subsection (c) applies to a very particular set of circumstances. Its cash-or-a-certified-check requirement is one of four that, if satisfied, compel a tax-sale purchaser to immediately sign a quitclaim deed.

So I respectfully dissent.

OCGA § 48-4-40 et seq. establishes a procedure by which "any person having any right, title, or interest in or lien upon [real property sold for the collection of taxes] may redeem the property from the sale by the payment of the amount required for redemption[.]" OCGA § 48-4-40. "The right to redeem property sold under a tax execution is conditioned upon the tender of the amount required for redemption[.]"

3

*Community Renewal & Redemption v. Nix*, 288 Ga. 439, 440 (1) (704 SE2d 759) (2011).

OCGA § 48-4-42 addresses the payment required for redemption. Subsection 48-4-42 (d) provides, "All of the amounts required to be paid by this Code section shall be paid in *lawful money of the United States* to the purchaser at the tax sale or to the purchaser's successors." (Emphasis supplied.)

We must construe the term "lawful money of the United States" liberally, to accomplish the objective of permitting redemption of the property. See *Reliance Equities, LLC v. Lanier 5, LLC*, 299 Ga. 891, 894 (1) (792 SE2d 680) (2016). As the majority notes, that expression is not defined in the specific article of the Code that provides for redemption. Nor is the term specifically defined elsewhere in Title 48, which concerns revenue and taxation.

So the majority turns to the Uniform Commercial Code. But we should not be so quick to turn away from Title 48. It does contain another use of the expression. And that use is illuminating.

OCGA § 48-2-31 provides, "Except as otherwise provided in Code Section 48-2-32, all *taxes* imposed by this title or any other revenue or license law *shall be paid in lawful money of the United States*, free from any expense to the state or any

4

political subdivision of this state." (Emphasis supplied.) The following section, OCGA § 48-2-32, further specifies the forms in which tax payments may be made. Read together, OCGA §§ 48-2-31 and 48-2-32 make clear that "lawful money of the United States" includes payments made by personal checks.

The first two subsections of OCGA § 48-2-32 provide explicitly for payment by personal check. Subsection (a) provides, "The commissioner may receive in payment of taxes and license fees *personal*, company, certified, treasurer's, and cashier's *checks* and bank, postal, and express money orders to the extent and under the conditions which he may reasonably prescribe by regulations or instructions." OCGA § 48-2-32 (a) (emphasis supplied). Subsection (b) provides in part, "A *check* or money order, when authorized, *shall be deemed to be payment* as of the time it is received by the commissioner, *provided* the check or money order is *duly paid upon presentation to the drawee*." OCGA § 48-2-32 (b) (emphasis supplied). Elsewhere, OCGA § 48-2-32 (f) specifies circumstances, such as sales tax, where the state revenue commissioner is authorized to require payment "by electronic funds transfer so that the state receives collectable funds on the date such payment is required to be made."

5

In short, under Title 48, taxes are payable in lawful money of the United States; and, unless otherwise specified, that means (among other things) personal checks.

These tax provisions inform the construction of the redemption provisions, because in construing a statute this court "look[s] to the text of the provision in question and its context within the larger legal framework to discern the intent of the legislature in enacting it." *Reliance Equities*, 299 Ga. at 894 (1) (citation and punctuation omitted). These tax provisions are part of that larger legal framework. There is no reason why "lawful money of the United States" would have a different meaning for redeeming property that has been sold for taxes than it does for paying taxes.

Moreover, this reading is consistent with our Supreme Court's holding that "the effect of the transaction [in which the taxpayer gave the tax collector a check] was to pay the taxes in lawful money[.]" *Palmer v. Harrison*, 165 Ga. 842, 843 (142 SE 276) (1928) (quoting Civil Code 1910 § 1013, which is a predecessor to OCGA § 48-2-31).

On the other hand, contrary to the majority, I do not find Georgia's Uniform Commercial Code helpful. The UCC, which was originally enacted after the redemption statutes now codified at OCGA § 48-4-40 et seq. And it neither defines

6

the term "lawful money of the United States" nor purports to constrain any existing meaning of that expression.

Citing OCGA § 11-3-104 of the UCC, the majority holds that a personal check is not a payment of lawful money because it is a negotiable instrument. But a certified check is also a negotiable instrument. It is defined within the article of the UCC addressing negotiable instruments as "a check accepted by the bank on which it is drawn." OCGA § 11-3-409 (d). As such, a certified check clearly falls within the more general definition of "check" set forth in OCGA § 11-3-104 (f) (defining "check" to include "a draft, other than a documentary draft, payable on demand and drawn on a bank"). Like other negotiable instruments discussed in OCGA § 11-3-104, a certified check is a promise to pay rather than the payment itself. See OCGA § 11-3-104 (a). It differs from a personal check in that the certifying bank, rather than the maker of the check, becomes obligated to pay upon its presentation. See *Harris v. Hill*, 129 Ga. App. 403, 405 (1) (199 SE2d 847) (1973) ("The certification of a check by the bank at the instance of the payee amounts to a payment of the check as to all parties except the payee and the bank."). See generally OCGA § 11-3-310 (a certified check discharges the maker's obligation, while an uncertified check suspends the maker's obligation until the bank acts to dishonor, pay, or certify the check).

7

Also misplaced is the majority's reliance on the phrase "in the form of cash or a certified check" in OCGA § 48-4-44 (c). Contrary to the majority's analysis, that phrase applies only in the very particular circumstances contemplated in that subsection.

The expression "lawful money of the United States" is in OCGA § 48-4-42. That Code section addresses payments on redemption. It is applicable to "[a]ll of the amounts required to be paid by this Code section[.]" OCGA § 48-4-42 (d).

OCGA § 48-4-44, on the other hand, addresses the quitclaim deeds tax-sale purchasers must execute upon redemption. Subsection (c), on which the majority relies, imposes on tax-sale purchasers the duty to execute a quitclaim deed immediately under specified circumstances. It provides,

> *If the quitclaim deed* provided for in subsection (a) of this Code section *is presented* to the purchaser at the time such person accepts the amount payable for the redemption *in the form of cash or a certified check*, the purchaser shall, *at that time*, sign the quitclaim deed *if a notary public and an unofficial witness are present* to witness such signature.

OCGA § 48-4-44 (c) (emphasis supplied). So subsection (c) sets out four preconditions. It applies "if" a proper quitclaim deed "is presented"; "if" the payment is "in the form of cash or a certified check"; "if a notary public . . . is present"; and

8

"if . . . an unofficial witness [is] present." Id. A tax-sale purchaser who is confronted with that tableau is under compulsion. The purchaser must, "at that time, sign the quitclaim deed." Id.

So OCGA § 48-4-44 (c)'s requirement of payment "in the form of cash or a certified check" is a sensible policy. It would not make sense to compel a tax-sale purchaser to immediately execute a deed in exchange for a check that might not be honored. But that form-of-payment requirement should not be severed from the compulsion to execute a deed "at that time."

If the requirements of OCGA § 48-4-44 (c) are not met, other subsections of OCGA § 48-4-44 require the purchaser to prepare a quitclaim deed but do not specify a deadline. OCGA § 48-4-44 should be construed to allow sufficient time to confirm that a check had been duly paid upon presentation to the drawee.

So OCGA §§ 48-44-42 (d) and 48-4-44 (c) serve different purposes: OCGA § 48-44-42 (d) identifies the currency that must be used to redeem property that had been sold for taxes, while OCGA § 48-4-44 (c) establishes the circumstances under which the purchaser of that property must immediately sign a quitclaim deed conveying title back to the redeeming party. The specification of cash and certified checks, rather than "lawful money," in the particular context of quitclaim deeds under

9

subsection (c) addresses the principle that a party who purchased the property at a tax sale "has expended his money and is entitled to a refund thereof before he is required to surrender title to the property." *Forrester v. Lowe*, 192 Ga. 469, 475 (2) (15 SE2d 719) (1941).

The General Assembly chose to use different terms in OCGA § 48-4-42 (d) and OCGA § 48-4-44 (c), and in construing the statutes this court "must give meaning to this choice of words." *Ga. Govt. Transparency & Campaign Financial Comm. v. New Ga. Project Action Fund*, 359 Ga. App. 32, 34-35 (2) (a) (856 SE2d 733) (2021). Because the General Assembly used "certain language in one part of the statute and different language in another, [we should] assume[ ] different meanings were intended." *Pandora Franchising v. Kingdom Retail Group*, 299 Ga. 723, 728 (1) (b) (791 SE2d 786) (2016) (punctuation omitted). The one phrase is not merely a substitute for the other. See *Ga. Govt. Transparency & Campaign Financial Comm.*, 359 Ga. App. at 35 (2) (a).

For these reasons, I disagree with the majority's conclusion that a personal check cannot be used to make the payment of lawful money required to redeem property under OCGA § 48-4-42 (d). The check was a proper tender under a liberal construction of that statute. So I would reverse the trial court's judgment. See

10

*Durham v. Crawford*, 196 Ga. 381, 385 (3) (26 SE2d 778) (1943) ("if the amount required by law is paid, or a proper tender thereof is made, within the redemption period allowed, the effect . . . is 'to put the title conveyed by the tax sale back into' the owner") (quoting Code 1933 § 92-8302, which is the predecessor to OCGA § 48-4-43). See also *Nix v. 230 Kirkwood Homes, LLC*, 300 Ga. 91, 98-99 (3) (793 SE2d 402) (2016).

Because I would reverse on the ground that a proper tender was made in this case, I would not reach the question of whether, under *Mark Turner Properties v. Evans*, 274 Ga. 547 (552 SE2d 492) (2001), the tax-sale purchaser's conduct "dispenses with the formality of making a legal tender." Id. at 550 (3). But there is a strong argument for the proposition that the purchaser's conduct in this case *did* dispense with such formality under *Mark Turner Properties*, and the judgment cannot be affirmed without addressing that argument. The majority, however, does not do so. Instead, in distinguishing *Mark Turner Properties*, the majority simply reiterates the incorrect conclusion that no legal tender was made.

11